*Christopher Nguyen v. State of Maryland*, No. 13, September Term, 2024, Opinion by Booth, J.


**POLICE OFFICERS—COMMON LAW DUTIES OWED TO THE PUBLIC.** To the extent Maryland common law imposes legal duties on police officers, the officers owe those duties to the public, rather than to individuals, absent a special relationship. The State brought a criminal charge of reckless endangerment against a former police officer for failing to protect a member of the public from an assault by another member of the public. One element of the offense of reckless endangerment is proof of a legal duty to act under the circumstances presented. Here, where the evidence at trial showed that the assault was spontaneous and unforeseeable, the State was required to prove that the former officer had a legal duty to act to protect the victim from an unforeseeable assault. The State did not carry that burden. Thus, the State failed to establish that the defendant had a legal duty to act sufficient to sustain a criminal conviction for reckless endangerment.

**POLICE OFFICERS—DUTY BASED ON SPECIAL RELATIONSHIP.** The State failed to prove the existence of a special relationship between the former police officer and the individual who was assaulted by a third person because the individual who was assaulted was never in police custody.

Circuit Court for Baltimore City
Case No.: 621224002
Argued: November 8, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 13

September Term, 2024

CHRISTOPHER NGUYEN

v.

STATE OF MARYLAND

Fader, C.J.,
Watts,
Booth,
Biran,
Gould,
Eaves,
Killough,

JJ.

Opinion by Booth, J.
Watts, J., dissents.

Filed: July 30, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal arises from the State's prosecution of a police officer for the crime of reckless endangerment[1] arising from an unprovoked and spontaneous assault on a member of the public by a third person that occurred in the police officer's presence. We must determine whether the State proved that the police officer had a common law duty to act to protect the victim of the assault under the facts of this case. If we determine that the State failed to establish a legal duty under the common law, the State asks us to determine, alternatively, that the police officer owed a duty to the assault victim because of the existence of a special relationship. Finally, we are also asked to determine whether the State introduced evidence sufficient to permit the trier of fact to conclude beyond a reasonable doubt that the officer's conduct constituted a gross departure from the standard of conduct that a reasonable similarly situated officer would have observed.

The Petitioner, Christopher Nguyen, a former officer of the Baltimore Police Department, was convicted of reckless endangerment in the Circuit Court for Baltimore City. The conviction arose in the context of then-Officer Nguyen's investigation into an assault between two individuals that had not occurred in his presence. When Nguyen arrived on the scene, one of the individuals, later identified as Wayne Brown, was lying on the ground semi-conscious and covered in blood. The other individual, Kenneth Somers, was sitting in his truck talking on his cell phone. When questioned by Nguyen, Somers

---

[1] Maryland's reckless endangerment statute prohibits a person from recklessly engaging in conduct "that creates a substantial risk of death or serious physical injury to another[.]" Md. Code Ann. (2021 Repl. Vol.), Crim. Law ("CR") § 3-204(a). Reckless endangerment under § 3-204 is a misdemeanor, and a person who is found guilty of this misdemeanor "is subject to imprisonment not exceeding 5 years or a fine not exceeding $5,000 or both." *Id.* § 3-204(b).

acknowledged that he assaulted Brown for allegedly stealing his car. In the minutes during which Nguyen was attempting to conduct his investigation, Somers walked up to Brown and kicked him in the head. The State charged Nguyen with the crime of reckless endangerment for failing to prevent Somers's spontaneous kick.

After a bench trial, the trial judge determined that Nguyen had a duty to protect Brown. The court found Nguyen guilty of reckless endangerment, concluding that a reasonable officer would not have allowed Somers to approach Brown, reasoning in part that "[a]ll the [police officer] witnesses" testified that "they would not have allowed it." The Appellate Court affirmed in an unreported opinion. *Nguyen v. State*, No. 1495, 2024 WL 277450 (Md. App. Ct. Jan. 25, 2024). Nguyen filed a petition for writ of certiorari asking this Court to determine whether he had a common law duty to protect Brown from Somers's assault, and, if so, whether the State established beyond a reasonable doubt that Nguyen's conduct constituted a gross departure from the standard of conduct that a reasonable similarly situated officer would have observed. The State filed a cross-petition for writ of certiorari asking us to hold that a special relationship existed between Nguyen and Brown due to Brown's status as a pre-trial detainee in custody.

For the reasons set forth herein, we hold that the State did not prove that police officers have a legal duty to prevent a member of the public from committing a spontaneous and unforeseeable assault against another member of the public. On the facts of this case, the State failed to prove that Nguyen had a duty to prevent Somers's assault. We similarly hold that the State failed to establish that a special relationship existed between Nguyen and Brown. In light of our holding that the State failed to establish that Nguyen owed

2

Brown a legal duty: (1) under the common law to protect him, as a member of the public, from a spontaneous assault by another member of the public; or (2) because of the existence of a special relationship, we do not reach Nguyen's argument that the State failed to establish beyond a reasonable doubt the remaining elements required for a reckless endangerment conviction.

# I

## Background

On the afternoon of August 12, 2020, Nguyen, a rookie Baltimore Police Officer,[2] responded to a report of two men fighting inside a gold Lincoln sedan in a residential neighborhood of Northeast Baltimore. When arriving on the scene, he observed Brown lying face down on the sidewalk near a gold sedan, and Somers talking on his cell phone while sitting in the driver's seat of a pickup truck stopped in the middle of the roadway.[3] Nguyen immediately called for a medic for Brown, who was bloodied and unresponsive.

Nguyen then approached Somers and asked him if he had been fighting with Brown. Somers was still on the phone and did not respond. Nguyen then returned to check on Brown.

---

[2] Nguyen spent nine months in the police academy, followed by three months of field training before he began patrolling on his own. He had worked patrol alone for six months at the time of this incident.

[3] At trial, the main evidence relied upon by the State was the footage from Nguyen's body-worn camera. We rely on this footage for our description of the assault and the surrounding circumstances.

Upon reaching Brown, Nguyen leaned over to look at him more closely. Brown was semi-conscious, and there was blood on his face, his shirt, and the sidewalk near his head. Nguyen asked Brown "Sir, are you okay? Can you hear me?" Brown did not reply. Nguyen again approached Somers, who was now standing outside his truck.

Nguyen again asked Somers if he had been fighting with Brown. Somers admitted that they had fought over an allegedly stolen car, telling Nguyen "that n[----]r stole my car." Somers then took a few steps in Brown's direction but stopped and turned around. Nguyen initially followed Somers and then continued toward Brown.

Nguyen asked Brown for identification, but Brown remained unresponsive. Nguyen told Brown that medics were on the way. Nguyen then returned to his police cruiser to get a notepad and resumed questioning Somers. Somers had returned to the driver's seat of the pickup, was talking on his cell phone again, and appeared to be describing the circumstances surrounding the fight to the person with whom he was speaking. Somers stated, "I told him 'get out.' He told me to 'go f[--]k myself.'" Somers explained: "Now he's f[--]king laying on the sidewalk, like the piece of worthless trash he is."

Officer Franklin Phipps, another rookie police officer with the Baltimore Police Department, was the next officer to arrive on the scene. Upon seeing Brown's condition, Officer Phipps directed Nguyen to "stand by" or "stand by him" while he went to retrieve his medical kit.[4]

---

[4] It is difficult to discern whether Officer Phipps said "stand by" or "stand by him" in the footage from Nguyen's body-worn camera. At trial, Officer Phipps stated "I don't remember who I was directing stand by him to. It was just me letting [Nguyen] know that I'm going to step away. I'm going to grab my [medical] kit. I'll be back."

Nguyen, notepad in hand, resumed questioning Somers, who was still on his cell phone standing by his truck. As Nguyen questioned Somers and took notes, Somers ended his call and walked toward Brown. While Nguyen followed Somers and continued taking notes, Somers stood over Brown, bent down, and asked "Hey, can you see yet? Can you see? I want you to look at me real quick so you can remember me." At that point, Nguyen was about an arm's length away from Somers, when Somers stood up and, without warning, kicked Brown in the head.

Nguyen immediately put a hand on Somers's chest and told him, "Hey, hey, that's enough!" Officer Phipps approached with his Taser drawn and instructed Somers to put his hands behind his back. Officer Phipps and Nguyen then handcuffed and arrested Somers. The entire sequence of events—from Nguyen's arrival on the scene to the assault—lasted approximately five minutes.

Brown was transported by ambulance to the hospital. After the assault, Nguyen told Somers, "You did what you got to do to get your property back," and asked him if he had ever considered being a professional fighter.

Somers was charged with first-degree and second-degree assault, reckless endangerment, and wearing/carrying a dangerous weapon with intent to injure. *Sommers v. State*, No. 978, 2023 WL 6937397 (Md. App. Ct. Oct. 20, 2023).[5] He was convicted of

---

[5] Although the case title reflects the spelling of Somers's last name as "Sommers," the opinion reflects that the correct spelling of his name is "Somers." *Sommers v. State*, No. 978, 2023 WL 6937397 (Md. App. Ct. Oct. 20, 2023).

first-degree assault and reckless endangerment. The Appellate Court affirmed his convictions on appeal. *Id*.

**II**

**Procedural History**

A year later, the State charged Nguyen in the Circuit Court for Baltimore City with reckless endangerment and misconduct in office for not intervening to stop the assault.

### A. Circuit Court Proceeding

The case proceeded to a bench trial. In opening statements, the prosecutor told the court that "policy will show you [] [Nguyen] had a duty to protect." The State admitted into evidence two police department policies—Policy 301, which included the "Law Enforcement Code of Ethics," and Policy 305, which consisted of the Baltimore Police Department's "Values, Vision, and Mission Statements." Policy 301 stated:

> As a Law Enforcement Officer, my fundamental duty is to serve the community; to safeguard lives and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and to respect the constitutional rights of all to liberty, equality and justice.

Policy 305 stated:

> Fairness and Impartiality. We act with fairness, restraint, and impartiality in carrying out our duties. We work with the community to continually understand and overcome cultural influences and unconscious biases. We understand that our actions, combined with the way we treat members of the community, contributes to our legitimacy in the eyes of the public.

Policy 305 also contained the following mission statement:

> The Baltimore Police Department is dedicated to fostering trust with community members, safeguarding life and property, and promoting public safety through enforcing the law in a fair and impartial manner. Officers will

6

police with integrity, dignity, honor, and respect with a commitment to ensure the highest ethical standards are maintained.

In addition to the two Department policies, the State introduced Nguyen's body-worn camera footage and called three witnesses: Detective Vanessa Simpson, who investigated the incident; Officer Phipps, the other rookie at the scene during the incident; and Sergeant Charles Jones, who arrived on the scene after the incident. Nguyen testified in his own defense.

Detective Simpson, a 29-year veteran with over ten years of experience investigating police misconduct who was assigned to the Public Integrity Unit of the Baltimore Police Department, conducted a months-long investigation of the incident that included interviewing witnesses and reviewing body-worn camera footage and various reports. Despite her experience and knowledge of the case, the State did not ask her about the investigation or qualify her as an expert. Instead, the State used her as an authenticating witness for Nguyen's body-worn camera footage and the above-described policy statements.[6] Detective Simpson identified Policy 301 and read into the record the above-quoted one-paragraph statement from that policy.

On cross-examination, the defense qualified Detective Simpson as an expert in the Department's "training policies and procedures." She testified in that capacity about her investigative findings, including her conclusion that Nguyen did not commit a crime.

---

[6] The State also relied on Detective Simpson to note that Nguyen's body-worn camera footage contradicted some of the facts he had written in the statement of probable cause and charges for Somers—namely, that Somers had followed Nguyen before kicking Brown.

Detective Simpson added that, when reviewing the body-worn camera footage, she had been "surprised" when Somers kicked Brown, and that she did not see "a substantial risk of that kick taking place" prior to the moment of the assault.[7] She acknowledged that her investigation into Nguyen concluded with the determination that Nguyen's conduct "wasn't a criminal matter."

On further questioning, Detective Simpson agreed that "based off of [her] experience," she "probably" would have separated Somers from Brown or stood between them before the kick could occur. As to what a "reasonable officer" would have done, she first said that she could not "fairly" answer the question because a more experienced police officer might have handled things differently:

> [Prosecutor]: [Y]ou wouldn't allow a suspect to kick another person, because you would have placed yourself between them?
>
> [Det. Simpson]: I would.
>
> [Prosecutor]: Okay. And do you believe that's what any reasonable officer would have done?
>
> [Det. Simpson]: Again, because of my experience and expertise, *I really can't answer that fairly because I've been through numerous situations as a younger officer, maybe not.* Because when I first came on, I was only 21 and I was nervous. So I would have handled things differently then, opposed to the way I handle things now. *So I really can't answer that fairly.*

The prosecutor then asked the following question:

> [Prosecutor]: But talking about -- I'm speaking to level of experience or inexperience. But I'm talking about the reasonable

---

[7] Detective Simpson later stated, "normally, from my experience, I've never had anyone assault someone again after the fact."

> officer. Wouldn't a reasonable officer have placed him
> or herself between Mr. Brown and Mr. Somers?

[Det. Simpson]:     Yes.

On re-cross examination, defense counsel followed up on the prosecutor's questions

regarding what a reasonable police officer would have done:

[Defense Counsel]:  And when you say that, you're talking about a
                    reasonable officer with more experience; is that correct?

[Det. Simpson]:     Yes.

[Defense Counsel]:  Because when you go with officers['] different levels of
                    experience, the level that -- what they understand is
                    different; is that fair?

[Det. Simpson]:     I can speak on when I was a rookie, yes.

Detective Simpson acknowledged that the two policies presented and discussed in her

initial direct examination—Policies 301 and 305—were "generalized policies as to what

officers are supposed to do[,]" but that the policies did not address what an officer was

supposed to do in this particular scenario. On the State's re-direct examination, in response

to the prosecutor's questions, Detective Simpson acknowledged that Nguyen had a "duty

to protect" Brown while he was lying on the ground based on "police policy." She did not,

however, describe the policy to which she referred or any particular actions that Nguyen

was required to undertake to protect Brown.

The State's next witness, Officer Phipps, was questioned about his own body-worn

camera footage and the footage captured by Sergeant Jones's body-worn camera. Officer

Phipps noted that he did not see the moments preceding the kick because he had his back

to Nguyen and Somers. Officer Phipps testified that he was "shocked" by the kick because

neither Somers's behavior beforehand nor the service call suggested that Somers would kick Brown. He added that "normally people do not assault other people while police are standing there."

Officer Phipps testified that, at the time of the incident, he and Nguyen were both "brand new" officers and were "scared." Officer Phipps further testified that he took no action to investigate the incident because he was "hyper-focused" on treating Brown's injuries. Officer Phipps confirmed that, if his role and Nguyen's were reversed, he "would have just kept everyone separated" by putting himself "between all the parties involved." If Somers had tried to approach Brown anew, Officer Phipps stated that he "probably would have pushed him back and t[old] him to back up." Officer Phipps acknowledged, however, that his comments were offered with the benefit of hindsight and that he had done nothing before the kick to separate Somers and Brown.

The State's final witness, Sergeant Jones, responded to the scene after Nguyen called him for assistance. Sergeant Jones testified that if an officer encounters an injured person lying on the ground, the officer has a duty to protect that person if the officer is aware of "who the assailant is." Sergeant Jones acknowledged that a police officer has a general "duty to protect either a detainee or an injured person on scene[,]" but later agreed with defense counsel that this duty was based "on [the information that] the officer has in front of him or her[.]"

Despite Sergeant Jones's 19 years of experience as an officer at the time of the incident, he testified that, when reviewing Nguyen's body-worn camera footage, he had been "surprised" to see Somers kick Brown in front of Nguyen. Sergeant Jones

10

acknowledged, however, that it appeared from the footage that Somers's intentions "were not good" and that Nguyen should have impeded Somers's access to Brown or asked him to move away from Brown. Sergeant Jones also acknowledged that Nguyen could have had Somers sit on the curb or stay in his truck, but he disagreed with the suggestion that handcuffing Somers or moving him down the street were appropriate options.

Nguyen, testifying in his own defense, explained that he had wanted to be a police officer since high school and entered the police academy after college. His time at the academy lasted nine months and was followed by three months of field training. The incident occurred six months after he completed field training.

With respect to his conduct at the scene, Nguyen stated that he felt "overwhelmed" because of his "lack of experience[]" and was "just too tunnel visioned[,]" meaning he "was too focused on one objective"—gathering information. Nguyen testified that, with the benefit of "hindsight [and] with [the] experience" that he had at the time of trial, he would have kept Somers separated from Brown. Nguyen stated that "he simply did not know" what Somers intended to do when he approached Brown. The assault, Nguyen explained, "happened too quickly[,]" leaving Nguyen "caught off guard[.]"

Additionally, Nguyen testified that he believed that he had a duty to protect Brown:

[Prosecutor]: Okay. Do you recognize that you had a duty to protect Mr. Brown?

[Nguyen]: Yes.

[Prosecutor]: Okay. And do you recognize that your duty to protect Mr. Brown began the moment that you arrived on scene and approached and saw his condition?

11

[Nguyen]:         Yes, I arrived on scene, and I do recognize that as a police officer that is -- that is your duty. That's what you're supposed to do. But like I said, it's all because of my -- my lack of confidence at that time, my lack of experience at that time.

In his closing argument, in explaining the source of the officer's duty to protect, the prosecutor relied on a statement from the Department's website referencing the oath that police officers take to "protect and serve" Baltimore City residents.

The circuit court ruled from the bench after closing arguments, acquitting Nguyen of misconduct in office, but convicting him of reckless endangerment. The court stated that it was "essentially undisputed" that Nguyen "had a duty to protect Mr. Brown."

In finding that Nguyen's conduct deviated from that of a reasonable similarly situated police officer, the court referred to Detective Simpson's testimony that "a reasonable officer" would have separated Somers and Brown. The court also found that Officer Phipps's testimony was especially relevant to this analysis because Officer Phipps was also a "brand new officer[]" at the time and still testified that he would have kept Somers separated from Brown had he been in Nguyen's position. The court stated that Nguyen's testimony was "overall credible" but found that Nguyen had acted unreasonably, stating that there was "no level of tunnel vision" that should have led Nguyen to credit Somers's account of events or to describe Somers as "cooperative." The court identified the statements Somers made to Nguyen prior to the assault, as well as the statements Nguyen made to Somers after the assault, as helping to establish that Nguyen acted recklessly.

The court sentenced Nguyen to one year, suspending the entire sentence in favor of a term of probation for eighteen months. Nguyen resigned from the Baltimore Police Department after he was sentenced.

## B. *The Appellate Court of Maryland*

Nguyen timely appealed to the Appellate Court of Maryland, challenging the sufficiency of the evidence supporting his conviction. The Appellate Court affirmed his conviction. *Nguyen*, 2024 WL 277450, at *1. Although the Appellate Court rejected the State's argument that a special relationship existed between Nguyen and Brown, the Appellate Court held that Nguyen had "a duty to protect Brown, enforceable in a criminal proceeding[.]" *Id.* at *6. In so holding, the Appellate Court relied on *Ashburn v. Anne Arundel County*, 306 Md. 617, 628 (1986), where this Court stated that "the 'duty' owed by the police by virtue of their positions as officers is a duty to protect the public, and the breach of that duty is most properly actionable by the public in the form of criminal prosecution or administrative disposition." The Appellate Court dismissed Nguyen's contentions that its holding broke "new ground or alter[ed] the common law." *Nguyen*, 2024 WL 277450, at *6. The Appellate Court observed that the finding of a legal duty "is only one of a number of elements" necessary to establish reckless endangerment, and that a "criminal prosecution would probably be sought in only the most egregious of cases." *Id.* at *7.

Turning to the sufficiency of the evidence as to Nguyen's reckless mental state, the Appellate Court determined that, in the light most favorable to the State, it was rationally inferable that Nguyen knew that Somers posed a threat of death or serious injury to Brown

13

based on Somers's language and conduct at the scene. *Id.* at *8. Because Nguyen did not stop Somers from approaching Brown or restrain Somers when he began taunting Brown, the Appellate Court held that the evidence supported a finding that Nguyen consciously disregarded the risk posed by Somers. *Id.* Finally, the Appellate Court concluded that the State presented "significant testimony" that Nguyen's conduct was a gross deviation from the standard of conduct of a reasonable similarly situated officer, sufficient to support his conviction. *Id.* at *9.

## III

## Standard of Review

Whether Nguyen had a common law duty to prevent Somers's assault of Brown is a question of law that we review de novo. *Plank v. Cherneski*, 469 Md. 548, 569 (2020).

With respect to an appeal based upon sufficiency of the evidence, "it is not the function of the appellate court to undertake a review of the record that would amount to a retrial of the case." *State v. Pagotto*, 361 Md. 528, 533 (2000). "Rather, we must view the evidence in the light most favorable to the prosecution, and the judgment can be reversed only if we find that no rational trier of fact could have found the essential elements of the crime." *Id.* "In other words, in a sufficiency of the evidence challenge, the appellate court is not to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. Rather, the court only asks 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 534 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

14

## IV

## Discussion

### A.    *Reckless Endangerment*

The crime of reckless endangerment is codified at § 3-204(a)(1) of the Criminal Law ("CR") Article of the Maryland Annotated Code (2021 Repl. Vol.), which states, in pertinent part, that "[a] person may not recklessly: [] engage in conduct that creates a substantial risk of death or serious physical injury to another[.]"  Where the accused is a police officer, in determining whether the officer's conduct was reckless, "[t]he test is whether the [officer's] misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct" that a "reasonable police officer similarly situated" would observe.  *State v. Albrecht*, 336 Md. 475, 501 (1994) (quoting *Minor v. State*, 326 Md. 436, 443 (1992)).  In other words, "the reasonableness of the conduct must be evaluated not from the perspective of a reasonable civilian but rather from the perspective of a reasonable police officer similarly situated."  *Id.*

We apply a "reasonable police officer" standard to an officer's conduct in connection with evaluating an officer's criminal liability for reckless endangerment because a layperson has no duty to investigate a potential crime and has no knowledge of what a police officer is expected to do when the officer arrives on the scene in circumstances such as those presented here.  The reckless endangerment statute imposes criminal liability only for "*reckless* conduct," consisting of a gross departure from the standard of conduct, and not simply negligent conduct.  *See Pagotto*, 361 Md. at 549; *Albrecht*, 336 Md. at 501; *Minor*, 326 Md. at 443.  As the General Assembly has made

15

clear, where the State is seeking to establish criminal liability in connection with the performance of the officer's duties, the officer should not be held criminally liable for a negligent error in judgment that might have been handled differently with the benefit of hindsight.[8]

Reckless endangerment typically involves affirmative conduct. *See, e.g.*, *Minor*, 326 Md. at 443. However, in *State v. Kanavy*, 416 Md. 1, 10–11 (2010), this Court held that the conduct proscribed by the statute includes "the wilful failure to perform a legal duty." In that case, employees of a state juvenile detention facility were charged with reckless endangerment for failing to call 911 in a timely manner to obtain medical care for a child who was in their care. *Id.* at 5–7. The State alleged that this failure created a substantial risk of death and serious physical injury to the child, which resulted in the child's death. *Id.* at 6–7. The circuit court dismissed the indictment, finding that "conduct" under the reckless endangerment statute did not encompass omissions, and, alternatively, that the defendants were under no legal duty to act. *Id.* This Court disagreed with both points and reversed. *Id.* at 5.

With respect to the existence of a legal duty, we identified two sources of law—one constitutional and one statutory—that imposed a duty on the defendants to provide the child with medical care. *Id.* at 8–9. First, we noted that the Due Process Clause of the Fourteenth Amendment "requires the State to provide medical care to injured persons who

---

[8] We have not been asked to address whether Nguyen's conduct warranted discipline or termination of his employment. The record reflects that he resigned from his employment after his conviction. In the context of this case, we are concerned only with whether the State's evidence was sufficient to support a criminal conviction.

16

are in the custody of State agents." *Id.* at 8 (citing *Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244–45 (1983)). The reason for that, we explained, is:

> When the state by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

*Id.* at 9 (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989)) (emphasis omitted). Second, we held that it was "clear that the laws of Maryland imposed a duty to provide the deceased with appropriate medical care." *Id.* We cited two statutory provisions requiring employees of the Department of Juvenile Services to provide children in State care and custody with a safe, humane, and caring environment, as well as access to required services. *Id.*

We then turned to whether the term "conduct" in the reckless endangerment statute included "omissions." *Id.* at 9–10. We noted that reckless endangerment is a lesser included offense of grossly negligent involuntary manslaughter, which can be committed by "negligent omission to perform a legal duty." *Id.* (citation and emphasis omitted). We also observed that Black's Law Dictionary and the Model Penal Code, from which Maryland's reckless endangerment statute is derived, define "conduct" to include inactions and omissions. *Id.* at 11. We concluded "that the conduct proscribed by the reckless endangerment statute includes the wilful failure to perform a legal duty." *Id.* at 10–11.

We stated that to convict a defendant of reckless endangerment based on an omission, the State was required to prove beyond a reasonable doubt that: (1) "the

17

[defendant] owed a duty to obtain emergency medical care for the deceased"; (2) the defendant was "aware of his obligation to perform that duty"; (3) the defendant "knew that his failure to perform that duty would create a substantial risk of death or serious physical injury" to the person to whom the duty was owed; (4) a reasonable similarly situated person in the same position would not have disregarded his duty; and (5) the defendant "consciously disregarded his duty." *Id.* at 12–13.

Here, Nguyen asserts that the Appellate Court erred in holding that: (1) police officers have a common law duty to protect the public, and (2) the State provided sufficient evidence that Nguyen's failure to prevent Brown's assault constituted a gross departure from the standard of conduct that a reasonable similarly situated police officer would have followed. The State disagrees and asserts that Nguyen owed a common law duty to protect Brown from Somers's assault as a member of the public. Alternatively, the State argues that we should hold that a special relationship existed between Nguyen and Brown due to Brown's status as a pre-trial detainee in custody. The State also contends that there was sufficient evidence to establish the elements of reckless endangerment here.

"As a general proposition, 'a private person is under no special duty to protect another from criminal acts by a third person, in the absence of statutes, or of a special relationship. '" *Horridge v. St. Mary's County Dep't of Soc. Servs.*, 382 Md. 170, 183 (2004) (quoting *Scott v. Watson*, 278 Md. 160, 166 (1976)). We have defined duty as "an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Ashburn v. Anne Arundel County*, 306 Md. 617, 627 (1986) (quoting Prosser and Keeton on Torts § 53 (W. Keeton 5th ed. 1984)); *see also Pace*

18

*v. State*, 425 Md. 145, 155–56 (2012).  Because a person does not traditionally have a legal duty to protect another from the criminal acts of a third person, our first task is to determine whether the State proved that Nguyen had a legal duty to act under the facts of this case.  In the course of this case, the State identified two sources as establishing such a duty: the common law and Baltimore Police Department policy.  We will explore both.

The State asserts that Nguyen had a general common law duty, by virtue of his status as a police officer, to protect Brown as a member of the public.  The State asserts that it is an "undisputed principle of the common law" that police officers have a common law duty to protect the public, the breach of which is "punishable by indictment."  In support of its assertion of a common law duty, the State relies primarily on two cases—*South v. Maryland*, 59 U.S. 396, 402 (1855), and *Ashburn v. Anne Arundel County*, 306 Md. 617, 628 (1986)—which describe the "public duty doctrine" in the civil tort context.  The State argues that, for decades, the common law has recognized this criminally enforceable "public duty," which, according to the State, obligates a law enforcement officer to protect a member of the public from a third-party assault occurring in the officer's presence.  The State acknowledges that it cannot point to a similar case in which a police officer has been found to be criminally liable for a failure to prevent a third-party assault arising from a general common law duty to protect the public.  That said, the State asserts that this duty exists, that it satisfies the duty element of the crime of reckless endangerment, and that we should "reaffirm" this "common law duty" to protect the public here.

The State is correct that both the United States Supreme Court and this Court have previously recognized that police officers owe certain duties to the public, as opposed to

19

any particular individuals, the breach of which can be punished by criminal prosecution. Some of those duties arise under the common law. But, as we will explain, the common law does not impose a duty on a police officer to act in every circumstance. Just as the duty the State had to prove in *Kanavy* was that the defendants "owed a duty to obtain emergency medical care for the deceased," 416 Md. at 12, the State here had to prove that Nguyen owed a duty to protect Brown from Somers's spontaneous and unprovoked kick. The common law established legal duties of law enforcement officers to act only in certain circumstances, such as during an affray or a riot, and statutes and regulations establish additional duties to act in other circumstances, such as to intervene to prevent another officer's use of excessive force. *See* Md. Code Ann., Pub. Safety ("PS") § 3-524(e)(2) (2022 Repl. Vol.) ("A police officer shall . . . intervene to prevent or terminate the use of force by another police officer beyond what is authorized[.]"). To meet the duty element of the crime of reckless endangerment, the State must prove that the officer had a duty to act to protect Brown in the circumstances presented. The State did not establish such a duty here.

### B. The Public Duty Doctrine

Because the State relies upon case law discussing the public duty doctrine, it is useful to start our analysis with a discussion of that doctrine. The doctrine provides that, "when a statute or common law 'imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.'" *Muthukumarana v. Montgomery County*, 370 Md. 447, 486 (2002) (quoting Dan B. Dobbs, The Law of Torts § 271 (2000)). "As such, under the public duty doctrine, law enforcement

20

'officers ordinarily may not be held liable for failure to protect specific persons because they owe no duty, as the first element of a negligence action[] requires, to those individuals.'" *Cooper v. Rodriguez*, 443 Md. 680, 714–15 (2015) (quoting *Muthukumarana*, 370 Md. at 486–87). "A frequently cited example is that 'the duty owed by the police by virtue of their positions as officers is a duty to protect the public,' and is thereby not enforceable in tort by a member of the public claiming that the police failed to protect them, specifically." *Pace*, 425 Md. at 157 (quoting *Ashburn*, 306 Md. at 628) (citation modified).

The United States Supreme Court discussed what has since come to be known as the public duty doctrine in *South v. Maryland*, 59 U.S. 396, 402 (1855). In that case, the plaintiff brought a tort suit for damages against a sheriff. *Id.* at 401. The plaintiff alleged "[t]hat the sheriff neglected and refused to protect and defend the plaintiff, and to keep the peace[.]" *Id.* The plaintiff asserted that the sheriff had failed to protect him from a mob who kidnapped him for four days and extorted money from him. *Id.* The Court ultimately determined that the sheriff could not be held liable for damages, as the sheriff did not participate in the imprisonment and his duties as a conservator of the peace were owed to the public at large, not to any particular individual. *Id.* at 402.

In the course of explaining that the sheriff did not owe any duty to keep the peace to the plaintiff in that case and therefore was not subject to a civil suit for damages by that plaintiff, the Court explained to whom the sheriff did owe a duty to keep the peace and what remedies were available for a breach of that duty. *Id.* at 402–03. The Court observed that "[i]t is an undisputed principle of the common law, that for a breach of a public duty,

21

an officer is punishable by indictment[.]" *Id.* at 402. The Court explained that the preservation of the public peace "is a public duty, for neglect of which he is amenable to the public, and punishable by indictment only." *Id.* at 403. That principle, the Court observed, was established by "[t]he history of the law for centuries[.]" *Id.* Accordingly, a civil action could not be "sustained against [the sheriff] for his default or misbehavior as conservator of the peace, by those who have suffered injury to their property or persons through the violence of mobs, riots, or insurrections." *Id.*

This Court recognized and applied the public duty doctrine in a similar manner in *Ashburn v. Anne Arundel County*. 306 Md. at 628. In that case, a police officer encountered a person in a parking lot sitting behind the wheel of a vehicle with the engine running. *Id.* at 619. The individual was intoxicated and could have been charged with driving while intoxicated. *Id.* at 619–20. The officer did not arrest the individual, but instead ordered him to park the car at the side of the lot and not to drive until the next day. *Id.* at 620. The officer then left the scene, and the driver later drove from the parking lot and struck a pedestrian, who was seriously injured. *Id.* The pedestrian sued the officer, the police department, and the county on the theory that the police had a mandatory duty under state law to detain all intoxicated drivers. *Id.* The circuit court dismissed the suit, in part because the officer owed no special duty to the pedestrian. *Id.* This Court affirmed. *Id.* at 635.

We opined that the duty "owed by the police by virtue of their positions as officers is a duty to protect the public[.]" *Id.* at 628. We further explained why a public duty, without more, does not create a duty to a specific individual that is enforceable in tort:

22

[P]ublic officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the unflinching discharge of their duties. . . . [T]he public interest is not served by allowing a jury of lay (persons) with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all.

[I]f the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victim. Such a result historically has been viewed, and rightly so, as untenable, unworkable and unwise.

Furthermore, a policy which places a duty on a police officer to [e]nsure the safety of each member of the community would create an unnecessary burden on the judicial system. Under such circumstances, the slightest error of a police[ officer] would give rise to a potential law suit.

*Id.* at 629–30 (citations and quotations marks omitted) (some alterations in original).

As the United States Supreme Court did in *South*, in the course of explaining why the pedestrian's civil lawsuit could not succeed for lack of a duty owed to him, we identified how the duty owed to the public may be enforced. We explained that a breach of a law enforcement officer's "duty to protect the public . . . is most properly actionable by the public in the form of criminal prosecution or administrative disposition." *Id.* at 628.

In *Ashburn*, we acknowledged an important exception to the public duty doctrine, which is the special relationship exception. *Id.* at 630–31. A special relationship exists when a public official creates a special relationship with the victim "upon which [the victim] relied." *Id.* It can also arise when "a statute or court order has created a *special duty* or specific obligation to a particular class of persons rather than to the public at large."

23

*Cooper*, 443 Md. at 715 (quoting *Muthukumarana*, 370 Md. at 487). Where a special relationship creates a duty to a specific person or category of persons, the public duty doctrine does not preclude recognition of that duty.

Our jurisprudence since *Ashburn* has continued to recognize the validity and underlying principles of the public duty doctrine, as well as the special relationship exception. *See, e.g.*, *Cooper*, 443 Md. at 714–15 (discussing the public duty doctrine and the special relationship exception); *Jones v. State*, 425 Md. 1, 21–22 (2012) (stating that "[w]e have recognized the policy undergirding the public duty doctrine and applied the doctrine in a number of cases" and discussing several of them); *Muthukumarana*, 370 Md. at 486–87 (discussing the public duty doctrine and the special relationship exception).

In summary, the public duty doctrine acknowledges that *where* there is a common law or statutory duty to protect, it is a duty owed *only to the public* and not to any individual, absent a special relationship. But, as recognized by the United States Supreme Court in *South* and by this Court in *Ashburn*, that does not mean the violation of such a duty is unenforceable. Instead, it means that the proper enforcement mechanism is "criminal prosecution or administrative disposition." *Ashburn*, 306 Md. at 628; *see also South*, 59 U.S. at 403. However, these cases simply *acknowledge* that a breach of a duty owed to the public can form the basis for criminal liability where a duty exists—the cases do not *establish* a duty or say anything about the scope of the public duties officers owe to the public. For that, we must examine the common law duties of law enforcement officers. As discussed below, the common law did not establish a broad duty owed by police officers to protect members of the public from an unforeseeable assault by a third party.

24

### C. Law Enforcement's Common Law Powers and Duties

Nearly all powers and responsibilities of modern police officers trace back to their common law predecessors. *See* Md. Const. Art. IV, § 44 (explaining that each county and Baltimore City shall elect a sheriff who performs duties "as now are or may hereafter be fixed by law"); PS § 2-412(b)(1) (noting that police officers possess "the same powers, privileges, immunities, and defenses as sheriffs, constables, police officers, and other peace officers possessed at common law"). This Court has recognized that, unless explicitly abrogated by statute or rule, a sheriff's common law duties remain intact. *Prince George's County v. Aluisi*, 354 Md. 422, 439 (1999).

At common law, sheriffs and other peace officers had well-defined responsibilities that fell into three primary categories. First, in the role of "king's bailiff," sheriffs collected taxes, seized property for debts, and enforced financial judgments. 1 Joseph Backus, A Digest of Laws Relating to the Offices and Duties of Sheriff, Coroner and Constable 8 (1812). Second, as officers of the court, sheriffs and their deputies summoned juries, executed writs, maintained jails, and attended legal proceedings. *See* 1 William Blackstone, Commentaries on the Laws of England 338 (Oxford ed. 2016). Third, as "keepers" or "conservators" of "the king's peace," *id.* at 332, sheriffs, constables, and other peace officers preserved order by arresting offenders, suppressing riots and affrays, and leading the pursuit of criminals. *See South*, 59 U.S. at 402.[9]

---

[9] In *South v. Maryland*, the Supreme Court identified a fourth "judicial" role in which sheriff's presided over county civil courts. 59 U.S. 396, 401 (1855). That role does not relate to any duties of modern sheriffs.

The common law powers and duties of a "conservator of the peace" are relevant here. The Statute of Winchester, 1285, set forth the rules and practices of law enforcement for centuries. Jerome Hall, *Legal and Social Aspects of Arrest Without a Warrant*, 49 Harv. L. Rev. 566, 579 (1936). The King, as the "principal conservator of the peace," appointed officers who were responsible for maintaining the peace in the Kingdom—known as "conservators of the peace"—which included justices of the peace, sheriffs, and constables. 1 Blackstone, *supra*, at 338; *see also* A. J. McGillivray, *Justices of the Peace; The Origin of Their Office*, 50 Am. L. Rev. 241, 242 (1916). They possessed a variety of common law duties and powers.

### 1. Duty to Suppress Riots and Affrays

The conservator of the peace had a duty to suppress riots and affrays that occurred in his presence. 1 Blackstone, *supra*, at 245, 332 (explaining that a conservator of the peace's duties included "suppressing riots and affrays"); *see also* 4 William Blackstone, Commentaries on the Laws of England 145 (Oxford ed. 2016) (noting the duty of the constable to "keep the peace" by suppressing affray). Officers who were entrusted to keep the peace were subject to criminal prosecution for the "negligence of public officers," which was a misdemeanor at common law. *Id.* at 140.

Historically, the duty to suppress riots and affrays was directed at quelling public disturbances. At common law, a riot was when a group of at least three people disturbed

26

the peace through force or violence.[10]  4 Blackstone, *supra*, at 146.  A common law affray consisted of fighting between two or more persons in a public place that caused terror to the public.  *See id.* at 145 (explaining that affrays "are the fighting of two or more persons in some public place, to the terror of his majesty's subjects: for, if the fighting be in private, it is no *affray* but an *assault*"); *see also In re Tyrell A.*, 442 Md. 354, 358 n.1 (2015) ("The common law crime of affray is committed when mutual combatants cause fear and disruption to the public. . . . One of the principal differences between affray and common law assault and/or battery is that the victim of an affray is deemed to be the public, rather than an individual. . . . Presumably, an assault or battery may become subsequently an affray or an affray may 'morph' into an assault or battery.").

The duty to suppress riots and affrays was reactive: it arose once a riot or affray was in progress.  *See Mayor & City Council of Baltimore v. Silver*, 263 Md. 439, 452 (1971); *Mayor & Council of Hagerstown v. Dechert*, 32 Md. 369, 384–85 (1870); *South*, 59 U.S. at 402.

### 2. Power of Arrest

Conservators of the peace also enjoyed certain powers and duties related to arresting those who broke the law.  They had the power to arrest individuals who, in their presence, breached the peace or threatened to breach the peace.  *See Mitchell v. Lemon*, 34 Md. 176, 181 (1871) ("Such officers, by the common law, have full power to arrest and detain the

---

[10] To suppress a riot, peace officers could summon the *posse comitatus*, that is, conscript all males over the age of 15 to aid in enforcing the law.  4 William Blackstone, Commentaries on the Laws of England 146 (Oxford ed. 2016).

27

offender, where the offense is committed in their view[.]"); 1 Blackstone, *supra*, at 332

(explaining that a conservator of the peace "may apprehend, and commit to prison, all

persons who break the peace, or attempt to break it"); *South*, 59 U.S. at 402 (a conservator

of the peace's authority included the power, "upon view, without writ or process, [to]

commit to prison all persons who break the peace or attempt to break it").

A breach of the peace required "evidence of an affray, actual violence, or conduct

tending to or provocative of violence by others."[11]  *Wanzer v. State*, 202 Md. 601, 609

(1953) (explaining that, under the common law, a peace officer could make a warrantless

arrest for a crime committed in their presence and outlining the evidence needed to

establish a "breach of the peace" sufficient to justify such an arrest).  Similarly, an

attempted breach of the peace was tied to the use of force, the threat of an immediate use

of force, or the likelihood of imminent violence.  *See Price v. State*, 227 Md. 28, 37 n.3

(1961) (citing Restatement (First) of Torts § 116 (1934), and *Wanzer*, 202 Md. at 609).[12]

If a conservator of the peace had "probable ground[s] to suspect" that a person was likely

to commit a crime, they could, in their discretion, require the person to provide "security"

---

[11] Blackstone observed that "mere reproachful words" did not constitute a breach of
the peace, unless those words "amount[ed] to a challenge to fight[,]" and that "mere
quarrelsome words" did not arise to an affray, unless uttered at church, which was
considered a heinous crime.  4 Blackstone, *supra*, at 252–53, 145–46.

[12] Section 116 of the Restatement (First) of Torts defines a breach of the peace as
"a public offense done by violence or one causing or likely to cause an immediate
disturbance of public order."  The comment to § 116 notes that "[t]hreats or epithets
directed to another may or may not constitute a breach of the peace, depending upon the
likelihood that a disturbance will follow" and that "[t]he use of force, or the threat of an
immediate use of force, towards the person or land or chattels of another which constitutes
a crime is a breach of the peace."  *Id.*

28

or "recognizance"—a formal, court-recorded commitment to keep the peace or demonstrate good behavior. 4 Blackstone, *supra*, at 249–50. This security took the form of a pledged sum to the Crown, backed by sureties who would be liable if the obligation was violated. *Id.*; *see also United States v. Rahimi*, 602 U.S. 680, 695–97 (2024) (describing English and early American surety laws).

In contrast to a conservator of the peace's discretionary *authority* to arrest someone who breached the peace and to require a potential lawbreaker to post security, a conservator of the peace had the *duty* to "pursue and take all traitors, murderers, felons, and other misdoers, and commit them to [jail] for safe custody." 1 Blackstone, *supra*, at 332. Thus, at common law, conservators of the peace had both discretionary powers and mandatory duties. They had the *power* to detain those who committed a crime in their presence and to prevent people who were thought to be likely to breach the peace from doing so, and they had the *duty* to pursue and imprison certain lawbreakers.

### 3. Early Community-Style Policing and the Creation of the Modern Police Department

In addition to the appointment of conservators of the peace, the Statute of Winchester provided for the appointment of night watchmen and day constables— individuals who provided the first line of public protection. Hall, *supra*, at 579–80. The night watchman system was a form of community policing that arose in England. Under the rudimentary "community-service" style of policing, watchmen and constables were expected to be vigilant for signs of crime—not unlike the neighborhood watch programs that are common today. If the watchman or constable observed suspicious or criminal

activity, he was to raise a "hue and cry," and all townspersons were obligated to join in the pursuit of an offender.[13] *Id.* at 579. By the eighteenth century, it became "increasingly recognized" that the constable and watchman system was failing to provide adequate protection. *Id.* at 580. As urban areas in England became more populated, the British Parliament determined that a more formal structure was needed. *Id.* at 581–83. In 1829, Parliament passed the London Metropolitan Police Act, which established a full-time uniformed police force for the City of London. *Id.* at 583.

In the United States, the American colonies followed the same common law policing practices undertaken through a system of conservators of the peace, consisting of constables, night watchmen, sheriffs, and justices of the peace. Over time, and as areas became more populated, American police forces developed that were largely modeled on the London Metropolitan Police. Eric H. Monkkonen, *History of Urban Police*, 15 Crime & Just. Rev. Rsch. 547, 549 (1992). The duties of modern police forces remain grounded in those original common law duties, supplemented, of course, by constitutional requirements, statutes, and policies.

---

[13] The Statute of Winchester provided

> for the appointment of specified numbers of night watchmen for every city and borough, according to population; for the arrest and delivery of strangers to the sheriff; for hue and cry which the watchmen must levy and follow with all the Town, and the Towns near . . . from Town to Town. For the efficient prosecution of the underlying plan every man . . . from fifteen years and sixty years [was required to] maintain equipment according to his wealth.

Jerome Hall, *Legal and Social Aspects of Arrest Without a Warrant*, 49 Harv. L. Rev. 566, 579–80 (1936) (quotation marks omitted).

In sum, under the common law, law enforcement officers owed certain duties to the public, as the United States Supreme Court acknowledged in *South*, and as we acknowledged in *Ashburn*. Those duties required police officers to take action in certain situations, including to protect the public from affrays and riots. But there was no duty at common law to protect all members of the public in all situations. Such a result is unsurprising. In determining whether a duty arises under the common law, we analyze "classic factors," *see Kiriakos v. Phillips*, 448 Md. 440, 486 (2016) (citing *Ashburn*, 306 Md. at 627), most notably, foreseeability, *see Barclay v. Briscoe*, 427 Md. 270, 294 (2012) (explaining that "foreseeability is a critical element in ascertaining whether or not a duty exists" (quoting *Valentine v. On Target, Inc.*, 353 Md. 544, 551 (1999))); *see also Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 535 (1986) ("[W]here the risk created is one of personal injury, . . . the principal determinant of duty becomes foreseeability."). In the absence of an established duty or a foreseeable harm (and barring the existence of a special relationship), there generally is no common law duty to act. *See Ashburn*, 306 Md. at 628.

### D. The State Failed to Prove that Nguyen Owed a Duty to Brown as a Member of the Public Under the Facts of this Case

Every witness who testified at trial expressed their view that Somers's spontaneous kick was not foreseeable. Detective Simpson testified that she was "surprised" when Somers kicked Brown, and that she did not see a "substantial risk of that kick taking place" prior to the assault. She later added that, in her 29 years of experience, she had never seen someone assault another person in her presence. Officer Phipps testified that he was "shocked" by the kick because neither Somers's behavior beforehand nor the service call

31

suggested that Somers would kick Brown. He also expressed that it was abnormal for someone to commit an assault in the presence of police. Sergeant Jones similarly testified that he was "surprised" to see Somers kick Brown in front of Nguyen. And Nguyen testified that the assault "happened too quickly[,]" and "caught [him] off guard[.]"

The State had the burden to prove beyond a reasonable doubt that Nguyen had a duty to protect Brown from Somers's unprovoked, spontaneous assault. *See Kanavy*, 416 Md. at 12. The State has relied on two sources to supply that duty: the common law and Baltimore Police Department policies. As to the latter, the State introduced written policies containing broadly phrased statements pertaining to police officers' generalized duties to the public,[14] along with testimony by the State's sole expert, Detective Simpson, who acknowledged (in a single word response) that Nguyen had a duty to protect Brown based upon an unspecified policy.[15]

---

[14] As noted above, these policies contain broadly worded statements, including: "As a Law Enforcement Officer, my fundamental duty is to serve the community," and "Officers will police with integrity, dignity, honor, and respect with a commitment to ensure the highest ethical standards are maintained."

[15] The only testimony in the record pertaining to police policy came in the form of a question about whether Nguyen should have protected Brown based upon his general duty to protect the public:

[State]:          [W]hen [Brown] was laying on the ground, he should have been protected? There was a duty to protect him.

[Defense Counsel]:  Objection.

With respect to the common law, the State relies primarily on *South* and *Ashburn*. As we have discussed, however, those cases do not establish a duty to act in all circumstances or in any particular circumstance. Nor did the common law generally recognize a duty among law enforcement officers to act to protect the public in all circumstances. Although the common law did create a duty to act to protect the public in certain circumstances, including in cases of riot and affray, the State has not pointed us to any authority establishing a common law duty to act to protect a member of the public from a spontaneous, unforeseeable assault by a third person committed in the officer's presence.

The Baltimore Police Department policies are similarly unavailing. These broadly phrased policy statements do not establish a legal duty that Nguyen owed to protect Brown, as a member of the public, in the circumstances presented. *See, e.g.*, *Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md. App. 470, 493 (1995) ("Not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant." (quoting

---

| | |
|---|---|
| [State]: | Based on police policy? |
| The Court: | Overruled. |
| [Det. Simpson]: | Yes. |

As a matter of law, Detective Simpson's conclusory answer that Nguyen had a *general duty* to protect Brown was insufficient. As discussed herein, all of the witnesses testified that Somers's unprovoked kick was a surprise. Somers's unprovoked kick was not the type of conduct that any of the State's witnesses would have anticipated under the circumstances. We have not unearthed any common law that establishes a police officer's common law duty to protect a member of the public from an unprovoked and unforeseeable assault in the circumstances that were described by all of the witnesses here. Nor did Detective Simpson identify any statute, rule, or regulation that addressed the circumstances presented here that would give rise to a legal duty.

33

*Staggs v. Blue Cross of Md., Inc.*, 61 Md. App. 381, 392 (1985))); *see also Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (noting that agency policy statements, "by themselves, do not create statutorily mandated responsibilities" (citation omitted)); *Melville v. State*, 793 P.2d 952, 954 (Wash. 1990) (broad statutory policy statements do not typically give rise to enforceable rights and duties); *Morgan v. District of Columbia*, 468 A.2d 1306, 1317 (D.C. 1983) (holding that police department's "general orders" did not establish a duty). Phrases like "safeguard lives," "preserve public peace," and "prevent crime" reflect important goals that should guide officers, but they do not establish a particular legal duty to act under the facts presented here that can satisfy the first element of the criminal offense of reckless endangerment.

The State's sole expert witness, Detective Simpson, merely responded "yes" when asked if Nguyen had a duty to protect based on police policy—without citing any document, procedure, or standard to support her answer. Notably, the only policies to which she referred during other portions of her testimony were the same general policies just discussed.

Viewing the evidence in the light most favorable to the State, we determine that the State failed to establish that Nguyen owed a legal duty to protect Brown, as a member of the public, from an assault by a third party that, by all accounts, was spontaneous and unforeseeable.

***E. The State Failed to Establish that a Special Relationship Existed Between Nguyen and Brown***

The State filed a cross-petition asking this Court to hold that a special relationship existed between Nguyen and Brown due to Brown's status as a pre-trial detainee in custody. We similarly hold that the State failed to establish a special relationship here.

As discussed above, the existence of a special relationship provides an exception to the general rule that a law enforcement officer owes duties only to the public and not to individual members of the public. *See Ashburn*, 306 Md. at 630–31. A special relationship between an officer and an individual typically arises in two ways: (1) when an officer affirmatively acts to protect an individual, inducing specific reliance on police protection, *id.* at 631; or (2) when an officer takes custody of a person, depriving them of their normal ability to protect themselves, *id.* at 630 n.2 (citing *Lamb v. Hopkins*, 303 Md. 236 (1985)).

The State does not rely on the first theory. Nor does it argue that Brown's vulnerability created an implied reliance that could establish a special relationship. Instead, the State argues that Brown was in Nguyen's custody, but the record does not support that claim.

Brown was never in Nguyen's custody. Nguyen did not restrain Brown's freedom of movement, communicate to Brown that he was in custody, or take any other action indicating that he had assumed control over him. *See, e.g.*, *Jones v. Md.-Nat'l Cap. Park & Plan. Comm'n*, 82 Md. App. 314, 332 (1990); *Holson v. State*, 99 Md. App. 411, 418 (1994). The fact that Brown was transported to the hospital unaccompanied underscores that he was never in police custody. The State seemingly assumes that, had Brown not

35

needed medical care, he would have been arrested at the scene for car theft. But there is no basis to conclude that Brown would have been detained that evening. We do not know what justification Brown might have given the officers for being in possession of the car Somers claimed Brown had stolen.

Without custody, there was no special relationship, and without a special relationship, there was no duty owed directly to Brown. Given that the State failed to establish a legal duty to act under the circumstances presented, we need not address Nguyen's alternative argument related to the sufficiency of the evidence.

## V

## Conclusion

The State failed to prove that Nguyen owed a legal duty to act under the circumstances here to protect Brown, as a member of the public, from an unforeseeable assault by a third person. The State also failed to prove that Nguyen owed Brown a legal duty arising from a special relationship. Because the State failed to establish a legal duty to act under the facts and circumstances of this case, we do not reach Nguyen's argument relating to the sufficiency of the evidence. Accordingly, we reverse the judgment of the Appellate Court.

**JUDGMENT OF THE APPELLATE COURT REVERSED. COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

36

IN THE SUPREME COURT

OF MARYLAND

No. 13

September Term, 2024

_____

CHRISTOPHER NGUYEN

v.

STATE OF MARYLAND

_____

Fader, C.J.
Watts
Booth
Biran
Gould
Eaves
Killough,

JJ.

_____

Dissenting Opinion by Watts, J.

_____

Filed:  July 30, 2025

Respectfully, I dissent. I disagree with the Majority's determination that, to sustain a conviction for reckless endangerment, the State was required to prove the existence of a special relationship between Mr. Nguyen and Mr. Brown and that the State failed to do so because Mr. Brown was never in police custody. See Maj. Slip Op. at 2-3, 35-36. Relying on the type of duty necessary to establish civil tort liability for a police officer, the Majority essentially concludes that police officers may have a duty to protect the public in certain circumstances, but not individuals, unless the police officer has a special relationship with the individual such as the individual being in an officer's custody. See Maj. Slip Op. at 24-25, 34-36. I disagree.

From my perspective, the Majority's holding that the State failed to establish that Mr. Nguyen had a duty to protect Mr. Brown is erroneous and not supported by the evidence presented at trial. Based on overwhelming evidence that Mr. Brown was a victim of crime who had been assaulted and rendered incapacitated by Mr. Somers and that Mr. Nguyen, as the responding officer responsible for investigating the crime, engaged in conduct that increased the risk of danger, I would hold that Mr. Nguyen had a duty to protect Mr. Brown from further injury and his failure to act was obviously reckless. Applying the test set forth in State v. Kanavy, 416 Md. 1, 4 A.3d 991 (2010), which, in my view, allows for application of a standard different than the one applied by the Majority, I would conclude that the evidence demonstrated that Mr. Nguyen owed Mr. Brown a duty and is sufficient to support Mr. Nguyen's conviction of reckless endangerment. I would therefore affirm the judgment of the Appellate Court of Maryland.

In reviewing for the sufficiency of evidence, it is not this Court's function to engage

in a retrial. Generally, the elements of reckless endangerment are: "1) that the defendant engaged in conduct that created a substantial risk of death or serious physical injury to another; 2) that a reasonable person would not have engaged in that conduct; and 3) that the defendant acted recklessly." Jones v. State, 357 Md. 408, 427, 745 A.2d 396, 406 (2000) (citation omitted). When the defendant is a police officer, the reasonableness of the conduct is not evaluated from the perspective of a reasonable person, but of a reasonable police officer similarly situated. See State v. Albrecht, 336 Md. 475, 501, 649 A.2d 336, 349 (1994).

This Court has held that a person may be convicted of reckless endangerment based on the failure to perform a required duty, *i.e.*, passive conduct, and has set forth the elements of the offense that must be proven beyond a reasonable doubt. In Kanavy, 416 Md. at 4-5, 7, 4 A.3d at 992-94, a case in which Respondents were charged with only reckless endangerment, we considered the sufficiency of indictments charging employees of a juvenile facility with reckless endangerment for failing to obtain emergency medical assistance for a juvenile who died while in custody at the facility. Respondents moved to dismiss the indictment on the grounds that the reckless endangerment statute does not proscribe a failure to act. See id. at 4, 4 A.3d at 993. The circuit court granted the motion; and the Appellate Court affirmed. See id. at 4, 4 A.3d at 993.

Respondents contended that reckless endangerment requires proof beyond a reasonable doubt that a defendant "engage[d] in conduct that created a substantial risk of death or serious physical injury to another" for conviction. Id. at 10, 4 A.3d at 996 (cleaned up). We concluded, however, that "the conduct proscribed by the reckless endangerment

statute includes the willful failure to perform a legal duty." Id. at 10-11, 4 A.3d at 996.

We explained that it is clear that both the United States Constitution and the laws of

Maryland imposed a duty on Respondents to provide the deceased juvenile with medical

care. See id. at 8-9, 4 A.3d at 995. We unequivocally stated that to convict the defendant

of the type of reckless endangerment charged in the indictment, the State must prove

beyond a reasonable doubt the following:

> (1) the Respondent owed a duty to obtain emergency medical care for the deceased, (2) the Respondent was aware of his obligation to perform that duty, (3) the Respondent knew that his failure to perform that duty would create a substantial risk of death or serious physical injury to the deceased, (4) under the circumstances, a reasonable employee of the Department of Juvenile Services in Respondent's position would not have disregarded his or her duty to (in the words of the indictments) "contact emergency services (9-1-1) in a timely manner," and (5) the Respondent consciously disregarded his duty.

Id. at 12-13, 4 A.3d at 997-98. We reversed the judgment of the Appellate Court and

remanded the case to the circuit court for trial. See id. at 13, 4 A.3d at 998.[1]

---

[1]Where the reckless endangerment is allegedly based on active conduct rather than the passive failure to perform a duty, as explained in Minor v. State, 326 Md. 436, 443, 605 A.2d 138, 141 (1992), "[t]he test is whether the [defendant]'s misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create a substantial risk that the statute was designed to punish." In Minor, 326 Md. at 443, 605 A.2d at 141, where the defendant, daring his brother to play Russian roulette, handed him a loaded shotgun, which the brother discharged, killing himself, and the defendant had been charged with reckless endangerment only, we held that "guilt under the statute does not depend upon whether the accused intended that his reckless conduct create a substantial risk of death or serious injury[.]" Instead, "[t]he test is whether the [defendant]'s misconduct, viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create[d] the substantial risk that the statute was designed to punish." Id. at 443, 605 A.2d at 141. Applying the objective standard to the facts of the case, we concluded that the evidence was sufficient to support the

Using language from <u>Kanavy</u> out of context, the Majority concludes that the way to prove that an officer owes a duty to an individual is to prove the existence of a constitutional or statutorily imposed duty. <u>See</u> Maj. Slip Op. at 16-20. In <u>Kanavy</u>, 416 Md. at 9, 4 A.3d at 995, we observed that both the United States Constitution and Maryland statutes imposed "a duty" to provide the deceased juvenile with appropriate medical care. As such, we stated that "the conduct proscribed by the reckless endangerment statute includes the wilful failure to perform a legal duty." <u>Id.</u> at 10-11, 4 A.3d at 996. At another point, in setting forth what the State needed to prove beyond a reasonable doubt, we simply referred to a "duty." <u>Id.</u> at 12-13, 4 A.3d at 997-98. And, in summarizing the trial court's order, we noted that the trial court's memorandum opinion included the State's contention that "the statutory definition of conduct includes an omission, which would violate a specific duty owned [sic] by the Defendants to [the juvenile]." <u>Id.</u> at 6, 4 A.3d at 993. We ultimately concluded that the State needed to prove that the defendant "owed a duty to obtain emergency medical care for the deceased[.]" <u>Id.</u> at 12, 4 A.3d at 997. Thus, this Court did not hold that, in every instance, to establish the duty necessary for conviction of reckless endangerment based on an omission, the State must demonstrate a statutorily or constitutionally based duty.

The Majority recognizes that the State has identified two other sources as establishing the requisite duty: the common law and Baltimore Police Department policy.

---

conviction for reckless endangerment. <u>See</u> <u>id.</u> at 443-44, 605 A.2d at 141-42. When analyzing whether conduct is sufficient to support a conviction for reckless endangerment alone based on the active conduct of a police officer, the test set forth in <u>Minor</u> must be applied.

- 4 -

See Maj. Slip Op. at 19. The Majority purports to examine both sources of duty identified by the State and concludes: "To meet the duty element of the crime of reckless endangerment, the State must prove that the officer had a duty to act to protect Brown in the circumstances presented. The State did not establish such a duty here." Maj. Slip Op. at 20.

The Majority links the proof necessary to establish the existence of an officer's duty under the common law duty to protect an individual to proof that an officer has a special relationship with the individual, namely, proof that the individual was in the officer's custody. See Maj. Slip Op. at 24, 35-36. In addressing the issue raised by the State in its cross-petition, the Majority concludes that "the public duty doctrine acknowledges that *where* there is a common law or statutory duty to protect, it is a duty owed *only to the public* and not to any individual, absent a special relationship." Maj. Slip Op. at 24 (emphasis in original). In Kanavy, 416 Md. at 12-13, 4 A.3d at 997-98, we set forth a very specific set of elements that must be proven beyond a reasonable doubt to support a conviction of reckless endangerment based on the failure to perform a duty, which would bring Mr. Nguyen's conduct in this case squarely within what is required. We did not hold, however, that the requisite duty may be shown only by proof of a special relationship between an officer and the individual.

Based on the plain language of our holding in Kanavy, id. at 12-13, 4 A.3d at 997-98, to convict a defendant of reckless endangerment based on the failure to perform a duty, the State must prove that: (1) the defendant owed the victim a duty; (2) the defendant was "aware of his obligation to perform that duty"; (3) the defendant "knew that his failure to

perform that duty would create a substantial risk of death or serious physical injury" to the person to whom the duty was owed; (4) a reasonable similarly situated person would not have disregarded his duty; and (5) the defendant "consciously disregarded his duty." In this case, all of the elements of the test are met.

As to the first factor, the existence of a duty, I would hold that the evidence at trial demonstrated that Mr. Nguyen had an ethical duty as a Baltimore Police Department officer who responded to a crime scene to protect a vulnerable victim from further injury where the person responsible for the injury to the victim was still present and demonstrating aggressive behavior. I would conclude that a police officer has a duty to protect the public and keep the peace, and that, under the circumstances of this case, the duty extended to Mr. Brown where Mr. Brown was the incapacitated vulnerable victim of a crime that Mr. Nguyen responded to the scene to investigate, and the person responsible for the injury was present, noncompliant with requests from Mr. Nguyen, and demonstrating agitated behavior. The Majority, on the other hand, seems to hold that a police officer has no duty to protect a victim of crime from further injury, regardless of the victim's vulnerable physical condition or the officer's conduct at the crime scene, unless the officer has a special relationship with the victim by virtue of having taken the victim into custody. See Maj. Slip Op. at 35-36.

The evidence at trial demonstrated that Mr. Nguyen owed Mr. Brown a duty under the Baltimore Police Department ("BPD") Code of Ethics and Department Values, Vision, and Mission. At trial, the State presented the testimony of three members of the BPD: Detective Vanessa Simpson, Sergeant Charles Jones, and Officer Franklin Phipps.

Detective Simpson testified that she had been assigned to the Public Integrity Bureau of the BPD since 2016 and that her responsibility as a detective with that unit was to investigate police officers for allegations of misconduct. Detective Simpson testified that she had been investigating police officers for misconduct since 2011 on a district level and that she had received training from BPD commanders, attorneys, and in other jurisdictions about how to handle misconduct cases. Detective Simpson testified that she was assigned to investigate the incident that occurred in this case. When asked if Mr. Nguyen had a duty to protect based on police policy, Detective Simpson, who was qualified by the defense on cross-examination as an expert in the field of BPD training policies and procedures, responded "[y]es." In responding to the question, Detective Simpson referred to policies of the BPD that the circuit court had admitted into evidence.

In addition to Detective Simpson's testimony, Sergeant Jones testified that a police officer has a general "duty to protect either a detainee or an injured person on the scene[,]" based on the information that the officer has at the time. Officer Phipps testified, among other things, that if he had been the responding officer, he "would have just kept everyone separated" by putting himself "between all the parties involved."

The circuit court admitted into evidence as State's exhibits: BPD Policy 301, titled "Code of Ethics," and BPD Policy 305, titled "Department Values, Vision, and Mission." The BPD Code of Ethics contained a section labeled "Law Enforcement Code of Ethics," and the Department Values, Vision, and Mission set forth the principles that the BPD is dedicated to and included a section on fairness and impartiality. In a section titled "Purpose," the BPD Code of Ethics states: "The purpose of this policy is to establish a

canon of ethical behavior of which all employees are expected and required to abide."

Under the section labeled "Law Enforcement Code of Ethics," the BPD Code of Ethics states:

> As a Law Enforcement Officer, my fundamental **duty** is to serve the community; **to safeguard lives** and property; to protect the innocent against deception, the weak against oppression or intimidation; the peaceful against violence or disorder; and **to respect the constitutional rights of all to liberty, equality and justice.**
>
> *I will keep my private life unsullied as an example to all and will behave in a manner that does not bring discredit to me or to my agency. I will maintain courageous calm in the face of danger, scorn or ridicule; develop self-restraint; **and be constantly mindful of the welfare of others.** Honest in thought and deed both in my personal and official life, **I will be exemplary in obeying the law and the regulations of my department.** Whatever I see or hear of a confidential nature, or that is confided to me in my official capacity, will be kept ever secret unless revelation is necessary in the performance of my duty.*
>
> *
**I will never** act officiously or **permit personal feelings**, prejudices, political beliefs, aspirations, animosities or friendships **to influence my decisions**.*

(Italics in original).

Among other things, as its mission statement, the BPD's Department Values, Vision, and Mission stated:

> The Baltimore Police Department is dedicated to fostering trust with community members, safeguarding life and property, and **promoting public safety through enforcing the law in fair and impartial manner. Officers will police with integrity, dignity, honor, and respect, with a commitment to ensure the highest ethical standards are maintained.**

For his part, Mr. Nguyen testified that he recognized that he had a duty to protect Mr. Brown:

[PROSECUTOR:] Okay. Do you recognize that you had a duty to protect Mr. Brown?

[MR. NGUYEN:] Yes.

[PROSECUTOR:] Okay. And do you recognize that your duty to protect Mr. Brown began the moment that you arrived on scene and approached and saw his condition?

[MR. NGUYEN:] Yes, I arrived on scene, and I do recognize that as a police officer that is -- that is your duty. That's what you're supposed to do. But like I said, it's all because of my -- my lack of confidence at that time, my lack of experience at that time.

The Majority refers to the BPD Code of Ethics and Department Values, Vision, and Mission as "broadly phrased policy statements[.]" Maj. Slip Op. at 33. As support for the proposition that "broadly phrased policy statements do not establish a legal duty that [Mr.] Nguyen owed to protect [Mr.] Brown, as a member of the public, in the circumstances presented[,]" Maj. Slip Op. at 33, the majority opinion cites an Appellate Court case that quotes from another Appellate Court case—Bagwell v. Peninsula Reg'l Med. Ctr., 106 Md. App. 470, 493, 665 A.2d 297, 308 (1995) (quoting Staggs v. Blue Cross of Md., Inc., 61 Md. App. 381, 392, 486 A.2d 798, 804 (1985)). Both of those cases involve termination of employment. In Bagwell, 160 Md. App. at 492, 665 A.2d at 308, the appellant contended that an employee handbook promised an opportunity to conform his conduct to the employer's expectations and he argued that the employer breached the provisions of the employee handbook by firing him without first either issuing him a written warning or taking other action short of discharge. The Appellate Court found no merit in the contention and discussed the Staggs case, in which it had "explained that not all personnel policies and employee handbooks create enforceable contractual rights." Bagwell, 106

- 9 -

Md. App. at 492-93, 665 A.2d at 308 (emphasis omitted). And, quoting Staggs, 61 Md. App. at 392, 486 A.2d at 804, the Appellate Court stated: "Not every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant. . . . General statements of policy are no more than that and do not meet the contractual requirements of an offer." Bagwell, 106 Md. App. at 493, 665 A.2d at 308.

Although the Majority cites case law from the Appellate Court as support for the proposition that the BPD Code of Ethics and Department Values, Vision, and Mission do not establish a legal duty that Mr. Nguyen owed to safeguard Mr. Brown, see Maj. Slip Op. at 33-34, the two Appellate Court cases cited involved termination of employment and whether provisions in an employee handbook or an employer's policy statements created enforceable contractual rights with respect to matters such as discipline and termination, see Bagwell, 106 Md. App. at 492-93, 665 A.2d at 308; Staggs, 61 Md. App. at 392, 486 A.2d at 803-04. Tellingly, the Majority does not cite to any Maryland case law in which either this Court or the Appellate Court has stated that police department policies, particularly a Law Enforcement Code of Ethics and Department Values, Vision, and Mission statement, do not form the basis of a duty to which a police officer is bound to adhere.

By its plain language, the BPD Code of Ethics states that its purpose is to establish a canon of ethical behavior by which all employees are expected and required to abide. The Law Enforcement Code of Ethics begins by stating: "As a Law Enforcement Officer, my fundamental **duty** is . . . ." (Emphasis added). Under the BPD Law Enforcement Code of Ethics, among other things, a BPD officer has a fundamental duty to safeguard lives,

- 10 -

protect the weak against oppression and intimidation, and respect the constitutional rights of all to liberty, equality, and justice. The BPD Department Values, Vision, and Mission requires a police officer to enforce the law fairly and impartially with a commitment to ensuring that the highest ethical standards are maintained. Viewing the evidence in the light most favorable to the State, I would hold that the State established that, based on the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission, Mr. Nguyen, as the officer responsible for investigating Mr. Brown's injury, had a duty to safeguard Mr. Brown, a vulnerable victim, from further assault by Mr. Somers who, by all accounts, had already acknowledged having been responsible for Mr. Brown's existing injuries and who remained at the scene and became increasingly agitated. Mr. Nguyen had a duty to investigate the incident fairly and impartially and to respect Mr. Brown's constitutional rights to liberty, equality, and justice, and he failed to do so.[2]

The question of whether the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission created a duty for which the wilful failure to abide can be the

---

[2]Based on his own testimony, Mr. Nguyen acknowledged that he had a duty to protect Mr. Brown and that he was aware of the duty. Mr. Nguyen testified, among other things, that he "just was not thinking" while interacting with Mr. Sommers. It is unclear why the Majority repeatedly characterizes Mr. Somers's action in assaulting Mr. Brown as a "spontaneous and unprovoked" or "spontaneous and unforeseeable" kick. Maj. Slip Op. at 20, 34. Mr. Nguyen was not merely standing unaware of the threat that Mr. Somers posed to Mr. Brown while Mr. Somers engaged in a "spontaneous and unprovoked" or "spontaneous and unforeseeable" kick. Maj. Slip Op. at 20, 34. When Mr. Nguyen arrived, Mr. Brown was unresponsive, unable to speak, and described as "bleeding out" on the ground. Under these circumstances, to suggest that Mr. Brown would have been capable at that point of provoking Mr. Somers, in a manner that would have given Mr. Nguyen notice of Mr. Somers's imminent attack is absurd. It is equally absurd to characterize Mr. Somers kicking Mr. Brown in the head as spontaneous or unforeseeable.

- 11 -

basis of a conviction for reckless endangerment turns on how duty is defined in Kanavy. Contrary to the Majority's holding, it is plain that the evidence established that Mr. Nguyen had a duty to safeguard Mr. Brown under the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission. See Maj. Slip. Op. at 33. The question is whether it is the type of duty that this Court envisioned in Kanavy. As explained above, in Kanavy, 416 Md. at 11, 4 A.3d at 996, we stated that "the conduct proscribed by the reckless endangerment statute *includes* the wilful failure to perform a legal duty." (Emphasis added). In Kanavy, id. at 8-9, 4 A.3d at 995, under the circumstances of the case, the defendants had a statutory and constitutional duty to provide medical care to juveniles in State custody. For this reason, we explained that the conduct prohibited by the reckless endangerment statute included failing to perform a legal duty. In so stating, we recognized that the conduct prohibited by the reckless endangerment statute includes the wilful failure to perform a duty that may not be the equivalent of a legal duty. See id.

---

The facts are not that Mr. Somers engaged in a spontaneous, unprovoked, and unforeseen attack on Mr. Brown that Mr. Nguyen happened to witness. Before kicking Mr. Brown in the head in Mr. Nguyen's presence, Mr. Somers had already explained to Mr. Nguyen that he had "fought" with Mr. Brown because Mr. Brown had allegedly stolen his vehicle. As Mr. Nguyen followed Mr. Somers questioning him, Mr. Somers became agitated and eventually kicked Mr. Brown in the head. These circumstances demonstrate that it cannot reasonably be said that it was unforeseeable that Mr. Somers posed a continuing threat to Mr. Brown while he lay incapacitated on the ground. These circumstances also demonstrate that kicking Mr. Brown in the head was not unprovoked in Mr. Somers's view and that Mr. Nguyen was already aware of the facts that had provoked Mr. Somers's initial encounter with Mr. Brown and that could have provoked additional violence. While Mr. Nguyen, and others, may not have been able to predict the specific act of violence that Mr. Somers would engage in, it cannot reasonably be said that Mr. Somers posing a risk of danger to Mr. Brown was unforeseen. To indicate that Mr. Somers's kicking Mr. Nguyen in the head was spontaneous, unprovoked, and unforeseen is not consistent with the facts of the case.

at 11-13, 4 A.3d at 996-98. Undeniably, BPD police officers have a duty to follow the BPD Law Enforcement Code of Ethics, as well as the Department Values, Vision, and Mission, and this Court's holding in Kanavy recognizes that an officer's failure to abide by such a duty can form the basis of a conviction for reckless endangerment.

In addition to Mr. Nguyen having a duty under the BPD Code of Ethics and Department Values, Vision, and Mission, more frequent than a claim of liability based on the "special relationship" doctrine is a claim that someone who was *not* in police custody nonetheless was injured or died as the result of the conduct of a third party because of something a police officer did or failed to do in circumstances of obvious danger. This is called the "state-created danger" theory of liability. Kennedy v. City of Ridgefield, 439 F.3d 1055, 1067 (9th Cir. 2006). In McNack v. State, 398 Md. 378, 392, 920 A.2d 1097, 1105 (2007), a case involving an allegation that the State and Mayor and City Council of Baltimore violated a family's right to due process and equal protection under Article 24 of the Maryland Declaration of Rights, this Court discussed the state-created danger theory, stating:

> The state-created danger theory, where applicable, imposes liability on a governmental entity for private acts that if committed by the government would violate constitutionally protected rights, even when no special relationship exists between the governmental entity and the injured person. *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3rd Cir. 1996). Generally, this sort of claim is limited to situations in which the state increases the risk of harm to its citizens through its own affirmative acts. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062 (9th Cir. 2006) (stating that there may be a due process violation when the governmental action affirmatively places the plaintiff in a dangerous situation.); *Butera v. District of Columbia*, 235 F.3d 637, 650 (D.C. Cir. 2001) ("Regardless of the conduct at issue, however, the circuits have held that a key requirement for constitutional liability is

affirmative conduct by the State to increase or create the danger that results in harm to the individual."); *Carlton v. Cleburne County*, 93 F.3d 505, 508 (8th Cir. 1996) (finding that the Due Process Clause imposes a duty when the government affirmatively places an individual in danger when the person would not have faced that situation without the state action.).

(Emphasis omitted).

"It is well established that the Constitution protects a citizen's liberty interest in her own bodily security." Kennedy, 439 F.3d at 1061 (citing Ingraham v. Wright, 430 U.S. 651, 673-74 (1977); Wood v. Ostrander, 879 F.2d 583, 589 (9th Cir. 1989)). "[A]lthough the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action affirmatively places the plaintiff in a position of danger, that is, where state action creates or exposes an individual to a danger which he or she would not otherwise have faced." Id. (cleaned up).

In Kennedy, id. at 1062-65, the United States Court of Appeals for the Ninth Circuit explained that, to establish state-created danger liability, a party must show that the danger was affirmatively created or the individual was exposed to the danger due to state action, the officer at issue acted with deliberate indifference to the danger, and a reasonable officer would have recognized that the officer's conduct violated the individual's constitutional right. The Court stated:

> In examining whether an officer affirmatively places an individual in danger, we do not look solely to the agency of the individual, nor do we rest our opinion on what options may or may not have been available to the individual. Instead, we examine whether the officer left the person in a situation that was more dangerous than the one in which they found him. Thus, we ask first whether, as alleged, any affirmative actions by [the officer]

- 14 -

placed [the person] in danger that [the person] otherwise would not have faced.

Id. at 1062-63 (cleaned up).

In McNack, 398 Md. at 393, 920 A.2d at 1105, this Court explained that, when recognized by the various Federal Courts of Appeals, the state-created danger theory "has only been discussed in the context of claims brought under 42 U.S.C. § 1983 for alleged violations of an individual's civil rights—rights which are protected by the United States Constitution and federal statutes." We stated that the Supreme Court of the United States "did not make the state-created danger theory applicable to alleged violations of Maryland's, or any state's, constitution." Id. at 393, 920 A.2d at 1105. In DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189 (1989), the Supreme Court stated: "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not all common-law duties owed by government actors were constitutionalized by the Fourteenth Amendment." McNack, 398 Md. at 393, 920 A.2d at 1105-06 (cleaned up).[3]

In McNack, id. at 392-93, 920 A.2d at 1105, we observed that, as of that time, Maryland had not adopted the state-created danger theory of liability "as a basis upon which to recover for violations of Maryland's Constitution." (Footnote omitted). We stated that, "[t]o date, the General Assembly has not enacted, nor has this Court adopted,

---

[3]We read this language from DeShaney "to indicate that even though some common law torts have federal constitutional implications, it is up to the state legislatures and courts to establish the parameters for liability, if any, of each state's governmental actors with respect to civil remedies for alleged violations of an individual's state constitutional rights." McNack, 398 Md. at 393-94, 920 A.2d at 1106.

- 15 -

the state-created danger theory as a basis for recovery under Article 24 of the Declaration of Rights." Id. at 393, 920 A.2d at 1105. No case in Maryland, however, has addressed the state-created danger theory as a basis for proving reckless endangerment where a police officer's conduct is concerned.

In this case, reviewing the facts in the light most favorable to the State, I would conclude that Mr. Nguyen, as a police officer, had a duty not to affirmatively engage in conduct that placed Mr. Brown in danger that he otherwise would not have faced.[4] In other words, I would conclude that the state-created danger theory applies to alleged violations of the reckless endangerment statute and that officers plainly have a duty to refrain from engaging in conduct that creates or exposes an individual to a danger that the individual otherwise would not have been confronted with. Mr. Nguyen's actions in arriving at the crime scene and following Mr. Somers around, and questioning Mr. Somers as he grew more agitated, exposed Mr. Brown to an increased risk danger that he otherwise would not have faced. When Mr. Nguyen arrived, Mr. Somers was speaking on the telephone and at that time not interacting with Mr. Brown. Mr. Somers initially ignored Mr. Nguyen's attempt to question him and, according to the circuit court, was disrespectful to Mr. Nguyen. Nonetheless, Mr. Nguyen did not alter his approach. During Mr. Nguyen's

---

[4]In addition, although this is not an express finding that the circuit court made, Mr. Nguyen's conduct in interacting with Mr. Somers "viewed objectively, was so reckless as to constitute a gross departure from the standard of conduct that a law-abiding person would observe, and thereby create[d] a substantial risk that the [reckless endangerment] statute was designed to punish[,]" such that it would have satisfied the standard set forth in Minor, 326 Md. at 443, 605 A.2d at 141.

- 16 -

attempts to question Mr. Somers, Mr. Somers eventually ended his call and walked towards Mr. Brown, bent down, ridiculed him, and then kicked him in the head.

Mr. Nguyen acted with deliberate indifference to the danger that Mr. Somers posed. After arriving at the scene, Mr. Nguyen took no action to impede Mr. Somers from approaching Mr. Brown and failed to restrain or otherwise impede Mr. Somers when he bent down by Mr. Browns face and began taunting Mr. Brown. In the aftermath of Mr. Somers kicking Mr. Brown in the head, in a phone call to Sergeant Jones, Mr. Nguyen referred to Mr. Brown as the "suspect" and to Mr. Somers as "the good person[.]" When Mr. Nguyen spoke to Mr. Somers at the scene, he told Mr. Somers that he understood why Mr. Somers was "pissed off" at Mr. Brown and stated that "you got to do what you got to do." After Mr. Somers told Mr. Nguyen that it had been exciting for him to beat someone up, Mr. Nguyen asked him if he had ever thought about doing "professional fighting" and he suggested that Mr. Somers "probably would not be in cuffs if [he] didn't kick [Mr. Brown] right in from of" him (Mr. Nguyen). Mr. Nguyen's own statements support the inference that he acted with deliberate indifference. The circuit court found that Mr. Nguyen was "okay" with the "vigilante justice" Mr. Somers inflicted upon Mr. Brown.

A reasonable officer would have known that Mr. Brown, who was described as "bleeding out," had a right not to be placed in further physical danger by a police officer's conduct escalating the risk of danger and deliberate indifferent action at the crime scene. I would conclude that Mr. Nguyen had a duty to protect Mr. Brown, a vulnerable victim, from further injury by not engaging in conduct that exposed him to an increased risk of

- 17 -

danger, namely following Mr. Somers around questioning him as he was noncompliant and increasingly agitated, and that Mr. Nguyen failed to observe the duty.

Based on all of the above, under the circumstances of this case, it is clear that the State proved, as required under Kanavy, that Mr. Nguyen owed Mr. Brown a duty under the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission. In addition, in my view, Mr. Nguyen had a duty not to affirmatively engage in conduct that placed Mr. Brown in, and created, an increased risk of danger for Mr. Brown. As to the second Kanavy factor, testimony from police officers at trial established that a Baltimore police officer would be aware of the obligation to safeguard the wellbeing of an injured individual lying on the ground at a crime scene. Even without such testimony, it can be inferred that a police officer would be aware of the duty to prevent a person who had already acknowledged severely injuring another person from further assaulting the injured person. And in this case, no inference is necessary as Mr. Nguyen testified that he was aware that he had a duty to protect Mr. Brown. As to the third Kanavy element, given that Mr. Brown was described as lying on the ground and bleeding out, it would have been obvious that the failure to protect him from further injury would have posed a substantial risk of death or additional serious physical injury.

As to the fourth element, the State needed to establish only that a reasonable similarly situated officer would not have disregarded the duty. The proof that is required is that a reasonable similarly situated officer would not have failed to fulfill the duty at issue. Testimony from the State's witnesses at trial established this. Given the nature of the evidence in this case, a rational trier of fact easily could have found that a reasonable

officer similarly situated would not have failed to take some action to prevent Mr. Somers from approaching Mr. Brown—particularly, the second time when Mr. Somers kicked Mr. Brown in the head.

The final element of proof—that the officer at issue consciously disregarded the duty—demonstrates that, in the case of an alleged failure to act, it is deliberately unheeding the duty that forms the basis for criminal liability. In this case, even without taking the evidence in the light most favorable to the State, the evidence demonstrates beyond a reasonable doubt that Mr. Nguyen consciously disregarded his duty under the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission to safeguard Mr. Brown's welfare, to not let his personal feelings interfere with decision-making, and to respect Mr. Brown's constitutional right to justice. Mr. Nguyen, in his capacity as a police officer, responded to a crime scene, found a person on the ground incapacitated and a second person who admitted to having injured the person and who still demonstrated signs of aggressiveness, and, over a period of time, Mr. Nguyen questioned the second person and allowed him to freely approach the injured person and inflict further harm. Mr. Nguyen's statements at the scene in support of Mr. Somers, such as stating that Mr. Somers having to do what he needed to, wondering whether Mr. Somers had considered a career as a prize fighter, and referring to Mr. Somers as the good person, indicate that Mr. Nguyen deliberately unheeded the duty that he recognized he had as a police office to safeguard a vulnerable person from further injury.

In this case, the Majority appears to fault the State for having not presented expert testimony or having not called an expert witness who would have described in more

- 19 -

specificity the duty to protect based on the BPD Code of Ethics and Department Values, Vision, and Mission. See Maj. Slip Op. at 32-33 & n.15. It was not necessary, however, for the State to have presented expert testimony to establish the elements of reckless endangerment beyond a reasonable doubt  In Albrecht, 336 Md. at 482, 505, 649 A.2d at 339, 351, a case in which a police officer accidentally discharged a shotgun, killing a woman who did not present a threat to the officer while she stood in close proximity to innocent bystanders, we held that the trial court did not err in concluding that the officer's conduct was both "reckless and grossly negligent." The defendant had responded to a reported stabbing and, when executing a stop on the car the suspect had been riding in, accidentally discharged his shotgun, killing the driver who had gotten out of the car. See id. at 481-82, 649 A.2d at 338-39. The defendant had fitted the shotgun with a bandolier,[5] and when he stopped the vehicle, he drew the shotgun, put a shotgun shell in the chamber, racked it, and, with his finger on the trigger, aimed it at the driver who had exited the vehicle. See id. at 480-81, 649 A.2d at 338-39. As the defendant swung the shotgun to aim it at two other individuals, the shotgun discharged, killing the driver who was standing near a sidewalk that ran near a playground. See id. at 480-82, 649 A.2d at 338-39.

At trial, the issues in the case involved the appropriate standard for a police officer's use of deadly force and the Montgomery County Police Department's policies and procedures with respect to the display and use of shotguns during felony stops. See id. at

---

[5]A bandolier, or a sling, attaches to the shotgun and allows the owner to hold extra rounds of ammunition. See Albrecht, 336 Md. at 493, 649 A.2d at 344. In Albrecht, id. at 481, 649 A.2d at 339, adding the bandolier allowed the officer to hold fifteen extra rounds and added 2.39 pounds of weight to the weapon.

487, 649 A.2d at 342. The State presented the testimony of the Director of Training for the Montgomery County Police Department, regarding the directives contained in a departmental directive called the DD 83-15 on when a shotgun is the appropriate weapon to use. See id. at 488-89, 649 A.2d at 342-43. The State also presented the testimony of a Sergeant, who had been an instructor at the Montgomery County police training academy when the defendant was a police candidate. See id. at 490, 649 A.2d at 343. The Sergeant testified that "there was no reason, under th[]e circumstances, for an officer to rack his shotgun and that he [the Sergeant] would not have racked his shotgun[,]" and that "he would not have aimed the shotgun at the suspect with his finger on the trigger." Id. at 492, 649 A.2d at 344. The State also presented the testimony of a firearms instructor at the Montgomery County police training academy who testified a shotgun is "'more of an offensive weapon' than a handgun because the shotgun discharges 'multiple projectiles,' creating 'a better chance of [the officer] hitting whatever it is [he's] intending on shooting at.'" Id. at 492, 649 A.2d at 344. The firearms instructor testified that police candidates are instructed that an officer's trigger finger should be kept on the trigger guard and away from the trigger when the shotgun's safety is disengaged, so as to prevent "inadvertent" discharges. Id. at 492, 649 A.2d at 344.

> We concluded that
>
> there was ample evidence from which the trial court could have concluded that Albrecht did not comply with standard police procedures when he took *substantial steps to use* deadly force under the circumstances. Thus, the trial court could have concluded that Albrecht not only failed to exercise "extreme caution," but that he acted in a grossly negligent and reckless manner, thus failing to exercise even the most ordinary caution required by the guidelines.

- 21 -

Id. at 503, 649 A.2d at 350. We stated that we could not "as a matter of law, find that trial judge erred in concluding that Albrecht's actions, in their totality, were both reckless and grossly negligent." Id. at 505, 649 A.2d at 351. In reaching this conclusion, we at no point referred to any of the witnesses as having provided "expert testimony" or even mentioned that expert testimony had been given, much less implied that it was required.[6] In Albrecht, due to the nature of the issues concerning the operation and use of a shotgun and the use of deadly force, expert testimony was presented by both sides. We did not conclude or even imply that the State was required to present expert testimony to establish reckless endangerment.[7]

---

[6]This observation is not to imply that all of the witnesses who testified were lay witnesses. In its opinion, the Appellate Court stated that, at trial, both sides called expert witnesses. See Albrecht v. State, 97 Md. App. 630, 641, 632 A.2d at 163, 168 (1993). The purpose of this observation is to point out that, in Albrecht, we did not discuss the need for expert testimony in establishing evidence sufficient to support a conviction for involuntary manslaughter let alone for reckless endangerment or hold that such testimony was required.

[7]The situation is the same with State v. Pagotto, 361 Md. 528, 762 A.2d 97 (2000), another case cited by the Majority. See Maj. Slip Op. at 15-16. The basic facts of Pagotto, 361 Md. at 537-38, 762 A.2d at 102, are like those in Albrecht, namely, that an officer shot and killed an individual during a traffic stop without intending to pull the trigger. The defendant in Pagotto, like in Albrecht, was also convicted of gross negligence involuntary manslaughter and reckless endangerment. See id. at 533, 762 A.2d at 100. Just as in Albrecht, both sides presented expert testimony concerning police procedures for the use of deadly force and the use and handling of firearms. See id. at 539, 762 A.2d at 103. Just as we did in Albrecht, we discussed the standard for gross negligence involuntary manslaughter from Duren v. State, 203 Md. 584, 590, 102 A.2d 277, 280 (1954), and the test for reckless endangerment from Minor, 326 Md. at 443, 605 A.2d at 141. See Pagotto, 361 Md. at 548-49, 762 A.2d at 108. We explained that the State's theory of the case was that the conduct at issue was identical for both offenses. See id. at 550, 762 A.2d at 109. After analyzing the defendant's conduct, we held, however, that the evidence was insufficient to support the conviction for both involuntary manslaughter and reckless endangerment. See id. at 553, 762 A.2d at 110. Our disposition of the issues in Pagotto neither informs nor supports any inference or in particular the Majority's inference that, in

Because this case involves a police officer's failure to abide a duty, I would hold that the test set forth in Kanavy is applicable, and that the evidence adduced at trial satisfied the elements of the offense, establishing Mr. Nguyen's guilt beyond a reasonable doubt. To hold as the Majority does is to hold that a police officer has no duty to safeguard a victim of crime as the officer investigates the crime scene, unless the officer has a special relationship with the victim such as having taken the victim into custody. See Maj. Slip Op. at 34-36. This holding ignores that a police officer's duty to protect an individual may arise from other sources.

Viewed in the light most favorable to the State, the evidence demonstrated that, as Mr. Nguyen investigated a crime scene, he took no action whatsoever to prevent Mr. Somers, a man who had admitted to severely beating Mr. Brown (for allegedly stealing his vehicle) and who became agitated during questioning, from repeatedly approaching Mr. Brown and eventually assaulting him again.

The evidence produced at trial established the following. On August 12, 2020, Mr. Nguyen responded to a 911 call about two men fighting inside a gold Lincoln automobile. When Mr. Nguyen arrived at the scene, he observed a white truck blocking the road, a gold Lincoln vehicle with its driver-side door open, and Mr. Brown lying on the ground next to the Lincoln. Mr. Nguyen saw that Mr. Brown was "pretty bloodied up," and his face was swollen. Mr. Nguyen checked on Mr. Brown, found him unresponsive, and called for a medic. After calling for a medic, Mr. Nguyen asked a bystander what happened, and the

this case, the State's presentation was somehow deficient because there was a "sole expert[.]" Maj. Slip Op. at 32.

- 23 -

bystander pointed at a man standing by the white truck, talking on the phone. Mr. Nguyen approached the man, Kenneth Somers, and asked him what happened. Upon reviewing the Body Worn Camera ("BWC") footage, the circuit court found that Mr. Somers "blatantly ignored" Mr. Nguyen when he first approached Mr. Somers, and "disrespect[ed]" Mr. Nguyen by continuing to talk on the phone. Mr. Somers eventually responded to Mr. Nguyen and advised that he had "fought" Mr. Brown because, according to Mr. Somers, Mr. Brown had stolen his vehicle, the Lincoln.[8]

After Mr. Nguyen initiated contact with him, Mr. Somers began to wander the scene and was clearly agitated. Mr. Nguyen followed Mr. Somers around the scene as Mr. Somers talked on the phone and answered some of Mr. Nguyen's questions regarding the Lincoln. As Mr. Somers wandered, he stated that "that n[-----] stole my car, what the f[---]" and referred to Mr. Brown as a "worthless piece of trash." At one point, as he walked around, Mr. Somers approached Mr. Brown, but then turned and walked away before reaching him.

The BWC footage demonstrated that, after eventually being handcuffed, Mr. Somers told Mr. Nguyen that he was "hot" and "still had all them juices flowing" when he assaulted Mr. Brown a second time. The circuit court found that Mr. Somers's behavior towards Mr. Nguyen and the language he used in referring to Mr. Brown demonstrated that Mr. Somers had indeed been "hot" leading up to the assault. Significantly, the circuit court

---

[8]Mr. Somers claimed to have "tracked" the Lincoln to the scene and planned to surreptitiously take the car back, but when he arrived, Mr. Brown tried to drive away, and Mr. Somers blocked Mr. Brown from fleeing with his truck.

concluded that Mr. Nguyen did not alter his investigation in response to Mr. Somers's behavior—throughout the time leading up to the assault, Mr. Nguyen followed Mr. Somers around the scene, asking him questions regarding the alleged vehicle theft.

During that time, Mr. Somers clearly showed animosity and continued aggression toward Mr. Brown when he approached Mr. Brown a second time, crouched down near his head, and said, "Hey, can you see yet? Can you see? I want you to look at me real quick…so you can remember me." In those moments before the assault, rather than take any action to protect Mr. Brown, Mr. Nguyen continued to ask Mr. Somers questions related to the alleged vehicle theft as Mr. Somers ridiculed Mr. Brown. Mr. Nguyen only reacted after Mr. Somers kicked Mr. Brown in the head.

As an explanation for not detaining Mr. Somers sooner, Mr. Nguyen testified that he was "shocked" that Mr. Somers kicked Mr. Brown because he perceived Mr. Somers as compliant. Mr. Nguyen was asked at trial what he was thinking when Mr. Somers started to walk towards Mr. Brown a second time. Mr. Nguyen testified that he "thought nothing of it"—that Mr. Somers was compliant and "did not show any bad intent."[9] Given Mr. Somers's erratic and offensive behavior, however, the circuit court was entitled to find, as it did, that this testimony was not credible, *i.e.*, the evidence supported the circuit court's finding that Mr. Nguyen's testimony was not credible. Considering Mr. Somers's behavior leading up to the assault, it is clear that Mr. Somers was not displaying behavior that would

---

[9]In contrast, after watching the body-worn camera footage, Sergeant Jones was asked, based on his training and experience, what he believed Mr. Somers's intentions were right before the assault, when Mr. Somers was taunting Mr. Brown. Sergeant Jones responded: "I would say that his intentions were not good."

indicate compliance or cooperativeness, making Mr. Nguyen's continued following and asking questions of Mr. Somers's objectively unreasonable.

Significant evidence that a reasonable officer in a similar situation as Mr. Nguyen would have restrained Mr. Somers or would have at a minimum taken some action to separate him from Mr. Brown came from all three of the State's witnesses, who had experience working as police officers. Three of the State's witness who were police officers testified that they would have conducted themselves differently than Mr. Nguyen. Detective Simpson, an investigator with the BPD Public Integrity Unit and a member of the BPD for 29 years, who was accepted by the court as a defense expert witness in the field of the Department's training policies and procedures, testified that Mr. Nguyen had a duty to protect Mr. Brown. In addition, Detective Simpson testified that based on her experience, she "probably would have separated Mr. Somers, being that [she] was still investigating him to find out if he was a victim, suspect, or [] both." Detective Simpson testified that a reasonable officer would have placed themselves between Mr. Brown and Mr. Somers.[10]

Officer Phipps, an officer with the BPD for two and a half years, though a new officer on the day in question, testified that if a responding officer arrives on scene and feels that there is a necessity to place someone under arrest, the officer should arrest that

---

[10]Although the majority opinion relies primarily on testimony given by Detective Simpson that favored Mr. Nguyen's case, see Maj. Slip Op. at 7-9, 31-32, viewing the evidence in the light most favorable to the State, as it must be, Detective Simpson's expert testimony that Mr. Nguyen had a duty to protect Mr. Brown and that a reasonable officer would have behaved differently than Mr. Nguyen must be considered in the manner most favorable to the State, drawing any reasonable inferences in the State's favor.

person. When asked what he would have done if he had been in Mr. Nguyen's position, Officer Phipps testified that he would have put himself between the parties involved. Officer Phipps testified that when Mr. Somers attempted to approach Mr. Brown, he would have told him to back up because there was no reason for Mr. Somers "to be on top of him."

Sergeant Jones, a 21-year veteran of the BPD, testified that Mr. Nguyen should have asked Mr. Somers to move away from Mr. Brown right before the assault occurred or impeded Mr. Somers from kicking Mr. Brown. Though the witnesses did not identify one particular action that an officer should have taken when presented with the same situation as Mr. Nguyen, it is clear from their testimony that none of the officers would have allowed Mr. Somers to approach Mr. Brown, and that a reasonable officer would have done *something* to prevent Mr. Somers approaching Mr. Brown.

As Mr. Somers's behavior escalated, it became less and less reasonable for Mr. Nguyen to follow Mr. Somers around the scene and attempt to get information from him regarding an automobile theft rather than detaining him. The BWC footage that was admitted into evidence and played for the court during the bench trial revealed that after Mr. Somers kicked Mr. Brown in the head, the following exchange occurred between Mr. Nguyen and unidentified observers at the scene:

> UNIDENTIFED FEMALE SPEAKER: No, we just coming outside. I was about to go (indiscernible [])
>
> UNIDENTIFIED MALE[] SPEAKER: Why did you guys walk back -- that one guy walk back up to him? I don't understand that.
>
> UNIDENTIFIED FEMALE SPEAKER: That wasn't right. They way you

all -- you all let him (indiscernible [])

OFFICER NGUYEN: I didn't know he was going to do that --

UNIDENTIFIED FEMALE SPEAKER: But he shouldn't been that close to him if the conflict was between them. He should have never been able to walk up on that man like that.

This exchange demonstrates that witnesses at the scene questioned Mr. Nguyen as to why he and Mr. Somers walked back up to Mr. Brown. This exchange supports the conclusion that Mr. Nguyen's conduct exposed Mr. Brown to more danger than he otherwise would have faced.

In the initial moments of his investigation, Mr. Nguyen had been informed right away that Mr. Somers had assaulted Mr. Brown—so severely in fact that, in Mr. Nguyen's own words, Mr. Brown was "basically bleeding out." It would have been reasonable for an officer to have a person who had admitted to such an assault, and whose victim remained on the ground in a vulnerable condition, stay in a position away from the victim as the officer conducted the investigation in a safe manner.[11] But rather than place Mr. Somers in custody or even direct him to stay away from Mr. Brown, Mr. Nguyen took Mr. Somers at his word that Mr. Brown had stolen the Lincoln, a fact Mr. Nguyen had not confirmed,[12]

---

[11]Sergeant Jones testified that, although Mr. Nguyen could have placed Mr. Somers in handcuffs, police officers are taught to wait for backup before doing so for safety reasons. Once Officer Phipps arrived, which occurred before Mr. Somers approached Mr. Brown for the second time and before the assault occurred, this reasoning no longer applied. Additionally, Sergeant Jones testified that Mr. Nguyen could have asked Mr. Somers to sit on the curb or in his truck. Mr. Nguyen did neither.

[12]The circuit court found that Mr. Nguyen's testimony that he was "tunnel-visioned" regarding the theft was unreasonable because Mr. Somers admitted that the car was not registered in his name and Mr. Nguyen discovered the tag on the vehicle was a temporary

and allowed Mr. Somers to walk around the crime scene as he investigated.

As Mr. Somers exhibited increasingly aggressive behavior during the investigation—in particular, his use of offensive language (including the use of a racial pejorative) and his approaching Mr. Brown twice—it became clear that Mr. Nguyen was, as the circuit court found, "okay with the fact that [Mr. Somers] beat this other man because he stole his car." As such, Mr. Nguyen continued to investigate the alleged vehicle theft rather than act in a way that would have protected Mr. Brown. Mr. Nguyen allowed Mr. Somers—the man who had just brutally assaulted Mr. Brown and remained agitated—to roam the scene and approach Mr. Brown again, while ignoring, or failing to address, the escalating threat that Mr. Somers posed to Mr. Brown.

Even after Mr. Somers kicked Mr. Brown in the head in Mr. Nguyen's presence, as Mr. Nguyen was describing the incident over the phone to Sergeant Jones after the assault, he referred to Mr. Somers as the "good person" and Mr. Brown as the "suspect." When Sergeant Jones arrived on scene, Mr. Nguyen repeated that the "victim" was in Mr. Nguyen's police vehicle and the "suspect" was on the way to the hospital, referring to Mr. Somers and Mr. Brown, respectively.

Viewed in the light most favorable to the State, the evidence was more than sufficient to support the circuit court's finding that Mr. Nguyen believed that Mr. Somers was justified in beating Mr. Brown and therefore failed to take any action to safeguard Mr.

---

Delaware tag. At no point in his investigation did Mr. Nguyen alter his behavior in response to the information, which did not corroborate Mr. Somers's statement that he owned the Lincoln.

Brown. Mr. Nguyen can be heard on his BWC footage telling Mr. Somers after the assault that he "underst[ood]" why Mr. Somers attacked Mr. Brown and that Mr. Somers "[had] to do what [he had] to do" because the Lincoln was his company's vehicle. Mr. Nguyen also asked Mr. Somers if he ever thought about participating in professional fighting. In addition, Mr. Nguyen told Mr. Somers that he "probably would not be in cuffs if [he] didn't kick [Mr. Brown]…right in front of [him]." These statements illustrate Mr. Nguyen's reckless disregard of the risk of serious physical injury to Mr. Brown. Though these statements were made after the assault, they are evidence of Mr. Nguyen's state of mind prior to the assault and demonstrate that Mr. Nguyen consciously disregarded his duty to safeguard Mr. Brown.

As evidenced by the testimony of the State's witnesses and the BPD Law Enforcement Code of Ethics and Department Values, Vision, and Mission, someone who admits to beating a person who is still at the scene "bleeding out" should not be allowed to wander freely about the crime scene, much less repeatedly approach the victim and assault him again. Even without viewing the evidence in the light most favorable to the State, I would hold that, under the circumstances of this case, the State established that Mr. Nguyen had a duty to safeguard Mr. Brown from further injury and that a rational trier of fact easily could have found the essential elements of reckless endangerment beyond a reasonable doubt.

For the above reasons, respectfully, I dissent.